# Exhibit 2

# ADMINISTRATIVE SERVICES AGREEMENT

By and between

**Leading Edge Administrators**

14 Wall Street, Suite 5B

New York, NY 10005

And

The Providence Health Group

**121 S. Water Ave.**

**Gallatin, TN 37066**

This Administrative Services Agreement and accompanying exhibits and appendices which are attached hereto and incorporated herein (collectively referred to as the "Agreement") is made and entered into this first day of December, 2017, (the "Effective Date"), by and between The Providence Group, a corporation duly organized and existing under the laws of the State of Tennessee, with its principal place of business at 121 S. Water Ave. Gallatin, TN 37066 (hereinafter referred to as the "Plan Sponsor") and its subsidiaries, and Leading Edge Administrators ("LEA"), operating and existing under the laws of the State of New York with its principal place of business at 14 Wall Street, Suite 5B, New York, NY 10005 (hereinafter referred to as the "Claims Administrator") (individually referred to herein as a "Party" and collectively as the "Parties").

**WHEREAS**, the Plan Sponsor desires to make available a program of health benefits under the Plan to its employees and dependents;

**WHEREAS**, the Plan Sponsor wishes to contract with an independent third party to perform certain services with respect to the Plan as enumerated below;

**WHEREAS**, the Claims Administrator desires to contract with the Plan Sponsor to perform certain services with respect to the Plan as enumerated below;

**WHEREAS**, the parties intend that the Plan Sponsor shall be deemed a "fiduciary" for the Plan within the scope of this agreement and within the meaning of ERISA and Plan Sponsor shall have discretionary authority and final determinative capability where the Plan Sponsor has so delegated such responsibilities; and

**NOW, THEREFORE**, in consideration of the promises and mutual covenants contained herein, the Plan Sponsor and the Claims Administrator enter into this Agreement for administrative services for the Plan.

## 1. Purpose

1.1   The purpose of this Agreement is to state the terms and conditions by which the Claims Administrator will provide administrative services to the Plan Sponsor as it relates to the daily operations of the Plan(s).

The Parties acknowledge that:

(a)   This is a contract for those administrative services specifically set forth herein.

(b) The Claims Administrator shall not be obligated to disburse more in Claims payment under this Agreement than the Plan Sponsor shall have made available for the purpose of payment of Claims, unless required to do so by law or court order. In such instances Plan Sponsor will indemnify the Claims Administrator for the excess amount of the Claims paid.

(c) The Parties agree that this Agreement is not a contract of insurance under any Federal or State laws or regulations. The Claims Administrator does not insure, guarantee or underwrite liability. The Claims Administrator has no responsibility, and the Plan Sponsor retains sole responsibility, for payment of claims arising under the Plan and

    all expenses incidental to payment of Claims, subject to the accompanying Stop-Loss Policy.

(d) The Plan Sponsor agrees that the Claims Administrator is not a legal or tax advisor as a result of the performance of its duties under this Agreement. The Claims Administrator makes no representations concerning Federal, State, or local laws, rules or regulations applicable to the Plan. Plan Sponsor must seek its own counsel for legal and financial advice and guidance.

(e) Except as specifically set forth herein, this Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective legal representatives and successors; provided, however, neither Party may assign this Agreement or any or all of its rights or obligations hereunder (except by operation of law) without the prior written consent of the other, which consent may not be unreasonably withheld.

(f) The work to be performed by the Claims Administrator under this Agreement may be performed directly by it or wholly or in part through a subsidiary or affiliate of the Claims Administrator, or under an agreement with an organization, agent, advisor, or other person of its choosing; provided however that Plan Sponsor retains final authority to decide whether said organization, agent, advisor, or other person may be retained or utilized. Claims Administrator shall notify Plan Sponsor in writing of any such proposed arrangement at least thirty (30) days prior to the proposed effective date of such arrangement. No such delegation will relieve Claims Administrator of its obligations under this Agreement. Additionally, the Claims Administrator warrants that it will take all required steps under the Health Insurance Portability and Accountability Act ("HIPAA") to ensure that any delegate under this Agreement will comply with the Privacy Rules under HIPAA for purposes of the protection of the protected health information ("PHI").

(g) The Claims Administrator agrees to comply with any applicable State or Federal statutes or regulations regarding its operations, and shall be responsible for ensuring any delegated entity performs its obligations in accordance with any applicable State or Federal statutes or regulations and the terms of this Agreement.

## 2. Term of This Agreement

2.1 The initial term of this Agreement the twelve (12) month period commencing on December 1, 2017 and ending November 30, 2018 (the "Initial Term"). This Agreement may be automatically renewed by mutual agreement for successive periods of twelve (12) months each, with each subsequent twelve month period beginning on December 1st (the "Anniversary Date") of each year following the Initial Term. In any case, this Agreement is subject to the Termination provisions contained in Section 12.

## 3. Definitions

3.1 The following definitions shall apply during the Term of this Agreement and after its termination.

**Administrative Fees** means the fees charged by Claims Administrator, as set forth in Schedule "A", for the administrative services listed in Schedule "B," each as attached hereto and made a part hereof.

**Claim(s)** refers to a request by a healthcare provider or an employee for payment or reimbursement for health care services and supplies to the extent provided for under the Plan.

**Claim Amounts** means sums paid out under the Plan for Claims for Covered Services.

**Contributions** refer to the amounts contributed by Plan Sponsor pursuant to Schedule "A".

**Covered Services** means the care, treatments, services, or supplies described in the Plan Document as eligible for payment or reimbursement from the Plan and as specified in Schedule "C", attached hereto and made a part hereof.

**Employee** means the Plan Sponsor's or its subsidiary's covered employee.

**Employer** means Plan Sponsor (unless otherwise stated), and any successor organization, subsidiary or affiliate of such Plan Sponsor that assumes the obligations of the Plan under this Agreement.

**Expenses** mean the Administrative Fees, plus the premiums due for the Stop-Loss Policy, as set forth in Schedule "A".

**Financial Terms** means the terms which govern the Plan Sponsor's obligation to pay Claims Administrator and the mechanism and timing under which those payments are to be made, as more fully set forth in Schedule "A".

**Incur,** when used with reference to health care services or supplies, means the time when the health care services have been rendered, or the supplies provided, to or on behalf of an employee.

**Leading Edge** refers to Leading Edge Administrators, the Claims Administrator under this Agreement.

**Paid** refers to the time at which Claims Administrator has paid for the health care services rendered, or health care supplies provided, to or on behalf of an employee.

**Plan** means the benefit plan the Plan Sponsor has established as set forth in the applicable Plan Document.

**Plan Document** means the instrument or instruments that set forth and govern the duties of the Plan Sponsor and eligibility and benefit provisions of the Plan, which provide for the payment or reimbursement of Covered Services, as may be amended from time to time.

**Projected Claims** means the dollar amount of Claims that Claims Administrator estimates employees will incur during each year, month or week of a term of this Agreement.

**Stop-Loss/Reinsurance Policy** means the stop loss/reinsurance policy arranged by Claims Administrator. A separate policy between the insurance carrier and Plan Sponsor will be issued for stop loss.

**Summary Plan Document** means the separate plan document (including without limitation, the plan document, summary plan descriptions and other employee communications which Claims Administrator will provide to Plan Sponsor from time to time) which detail the benefits, limitations, co-payments, deductibles and conditions for coverage under the Plan.

**Utilization Management** means the review and evaluation of medical necessity and appropriateness of the use of health care services, procedures or facilities utilized by an employee under the terms of the Summary Plan Document. Utilization Review Services are only available to the extent provided for in the Plan. Pursuant to Section 1(f) hereof, Claims Administrator reserves the right to delegate the performance of these services to a subcontractor of its choice.

### 4. Responsibility

4.1     Plan Sponsor will be responsible for complying with all applicable provisions of the Employee Retirement Income Security Act of 1974 (ERISA), as amended. This includes the fiduciary responsibilities of establishing and structuring the Plan, maintaining adequate funding to support the Plan and making all final Claims decisions. Claims Administrator will be responsible for developing, maintaining, printing, and providing to Plan Sponsor and its covered employees copies of the Plan Document describing the Plan, and copies of a summary brochure of benefits, limitations, exclusions, and waiting periods. Claims Administrator will also be responsible for administering Claims as set forth in 4.2, below.

4.2     Plan Sponsor hereby delegates to Claims Administrator, and/or its subcontractors, authority to make initial Claims determinations on Plan Sponsor's behalf with respect to Claims for benefits under the Plan. Claims Administrator's administration shall be in compliance with all applicable laws including, but not limited to ERISA, ACA and HIPAA. In order to administer benefits under the Plan, Claims Administrator will supply employees with appropriate identification cards. For the purposes of ERISA, and any applicable similar state legislation, Plan Sponsor shall, however, be deemed the Administrator of the Plan.

4.3     In the exercise of its performance within the scope of this Agreement, Claims Administrator shall use the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

4.4     In the event that the Plan becomes subject to Federal or State laws or regulations mandating change in the benefits or in the eligibility of employees, Upon Plan Sponsor's approval Claims Administrator will implement such mandatory change at the time the law becomes effective with respect to the Plan, unless Plan Sponsor notifies Claims Administrator that, in the opinion of Plan Sponsor's legal counsel (which opinion shall be final), such laws or regulations are not applicable to the Plan or that the Plan has been amended in such a manner as renders such laws or regulations inapplicable to the Plan. Plan Sponsor agrees to hold Claims Administrator harmless, and to indemnify Claims Administrator, for any losses that result from actions taken by Claims Administrator in reliance upon Plan Sponsor's legal counsel's opinion on such matter.

4.5     In the event that a Federal or State law or regulation mandates that Plan Sponsor make changes to the benefits in the Plan, or in the rules of eligibility of employees, those changes will be effective on the date required by law or as specified by Plan Sponsor, provided Claims Administrator receives prior written notice. The Parties acknowledge and agree that adjustments to the Administrative Fees set forth in Schedule "A" may need to be made as the result of such mandates and that Plan Sponsor and Claims Administrator will mutually agree to the adjustment of such rates as required to allow Claims Administrator to continue to perform services under this Agreement.

4.6     The Claims Administrator will indemnify, defend, and hold the Plan Sponsor and its respective directors, officers and employees harmless from and against any and all claims, suits, actions, liabilities, losses, fines, penalties, damages, and expenses of any kind including, but not limited to court costs and attorney's fees, which Plan Sponsor may suffer or incur as a result of any dishonest, fraudulent, negligent, or criminal act or omission of the Claims Administrator or its employees, or by the Claims Administrator's breach of confidentiality or right of privacy of any Plan Participant, except for acts taken at the specific direction of the Plan Sponsor, or as required by law or regulation. Should the Claims Administrator be called upon to so indemnify the Plan Sponsor, it may at its discretion choose to handle any defense efforts necessary to counter claims against the Claims Administrator and/or the Plan Sponsor which would give rise to, and necessitate, said indemnification. The Claims Administrator shall be entitled to rely, without investigation or inquiry, upon any written communication(s) of the Plan Sponsor or agents of the Plan Sponsor. This indemnity does not extend to any acts or omissions other than those enumerated in this paragraph. This indemnity shall survive termination of this Agreement. The remedy for Claims payments made in error will be to seek recovery from the Employee or the provider of services. Claims Administrator shall use best efforts to affect such recovery. If Claims Administrator fails to affect the recovery, and Plan Sponsor is required to undertake its own efforts to do so, Claims Administrator shall reimburse Plan Sponsor for its reasonable costs in pursuing such recovery.

4.7     The Plan Sponsor will indemnify, defend, and hold the Claims Administrator and its respective directors, officers and employees harmless from and against any and all claims, suits, actions, liabilities, losses, fines, penalties, damages, and expenses of any kind including, but not limited to court costs and attorney's fees, which Claims Administrator may suffer or incur as a result of any dishonest, fraudulent, negligent, or criminal act or omission of the Plan Sponsor or its employees, officers or directors, or by the Plan Sponsor's breach of confidentiality or right of privacy of any Plan Participant except for acts taken at the specific direction of the Claims Administrator, or as required by law or regulation. Should the Plan Sponsor be called upon to so indemnify the Claims Administrator, it may at its discretion choose to handle any defense efforts necessary to counter claims against the Claims Administrator and/or the Plan Sponsor which would give rise to, and necessitate, said indemnification. The Plan Sponsor shall be entitled to rely, without investigation or inquiry, upon any written communication(s) of the Claims Administrator or agents of the Claims Administrator. This indemnity does not extend to any acts or omissions other than those enumerated in this paragraph. This indemnity shall survive termination of this Agreement.

## 5. Enrollment and Employee Requirements

5.1	The effective date or termination date of an employee's coverage will be the date Plan Sponsor specifies in written notice to Claims Administrator subject to compliance with group eligibility rules established by Plan Sponsor

5.2	Leading Edge agrees to process all completed enrollment transactions no later than seven (7) business days after Plan Sponsor sends completed enrollment information to Leading Edge.

5.3	Claims Administrator shall rely on the information provided by Plan Sponsor. Claims Administrator is not responsible for the accuracy of any information provided by Plan Sponsor. Plan Sponsor agrees to hold Claims Administrator harmless, and indemnify Claims Administrator for any losses, which result from the inaccuracy of any information contained in the enrollment transactions.

5.4	Plan Sponsor agrees to maintain enrollment information in auditable form. Claims Administrator will have access to this information for audit purposes on the same basis as set forth in Section 10. Claims Administrator will provide Plan Sponsor with a web-based "portal" to facilitate the maintenance of this information.

5.5	Claims Administrator will provide Plan Sponsor with access to enrollment reports indicating all enrollment transactions processed by Plan Sponsor during the prior month. Plan Sponsor agrees to review the accuracy of the enrollment reports and process any additional transactions as necessary to correct any errors all within thirty (30) days of Plan Sponsor's receipt of such a report.

5.6	Plan Sponsor will update enrollment information in accordance with customary practices and the Plan Document. These enrollment transactions shall include:

(a)	Additions of newly hired or otherwise eligible employees and/or dependents for coverage;

(b)	Changes in plan eligibility based on hours worked;

(c) and	Qualifying Events (i.e. Marriage, Divorce, Birth, Loss of other coverage etc.)

(d)	Termination of Coverage

## 6. Benefits/Claims Liability

6.1	Claims Administrator will administer and pay Claims for the benefits detailed in, and in accordance with, the Plan Document if the services and/or supplies were incurred after the effective date of this Agreement and prior to its termination. All Claims must be received within the applicable period set forth in the Plan Document and, subject to Section 7.4, while this Agreement is in effect. Responsibility for all final Claims decisions remains with Plan Sponsor. No action may be brought against Claims Administrator for failure to provide benefits unless brought within two (2) years from the date the cause of action arises.

7 | Page

6.2     Claims Administrator provides administrative Claims payment services only  Claims Administrator is not liable for any of the benefits provided under the Plan.

6.3     Plan Sponsor will be obligated to Claims Administrator for the scheduled Contributions for each employee until the date Claims Administrator receives Plan Sponsor's written notice of the employee's termination date.

6.4     Claims Administrator will furnish each employee with an explanation of each Claim that is paid, rejected, or suspended describing the specific reason for a rejection or suspension, in accordance with all applicable statutes and regulations, including but not limited to ERISA.

6.5     Claims Administrator agrees to hold confidential any medical information it receives with respect to an employee's Claims, except to the extent that such information must be disclosed as required by law Pursuant to HIPAA and its Privacy Rules. Claims Administrator agrees to defend, at its sole expense, indemnify and hold Plan Sponsor harmless for any Claims, action or loss that may arise at any time in the future out of Claims Administrator's unauthorized use or release of this information. This provision will continue in effect after Termination of this Agreement for any reason.

### 7. Payments/Credits

7.1 On a monthly basis, Claims Administrator will bill Plan Sponsor for the applicable premiums, or claims funding contributions, administrative fees and expenses set forth in Schedule "A". Plan Sponsor should review all invoices upon receipt. Unless alternative arrangements are made to receive funds prior to due date on invoice, the funds will be automatically withdrawn from the Plan Sponsor's account via ACH Electronic Withdrawal on the due date. An ACH Withdrawal form is enclosed with agreement.

7.2     If Plan Sponsor disputes a charge included on its invoice, Plan Sponsor must pay the full amount invoiced and notify Claims Administrator of those amounts in dispute. If Claims Administrator verifies that the charge is not Plan Sponsor's responsibility, Claims Administrator will credit Plan Sponsor's next invoice for such amount.  If such verification occurs after the termination of this Agreement, Claims Administrator will reimburse Plan Sponsor for such amount within sixty (60) days of being made aware of such amount.

7.3     If this Agreement is terminated, Plan Sponsor will still be liable for any outstanding expenses and all claims incurred prior to the termination date, but Paid by Claims Administrator after the termination date. Upon subsequent agreement between the Plan Sponsor and Claims Administrator, the Claims Administrator may continue to process these claims during the agreed run out period. Plan Sponsor would be subject to paying the Administrative Fees and Expenses for each month of the agreed run out period.

7.4     Claims Administrator will assist Plan Sponsor in making recoveries through application of subrogation, and in recovering payments made upon fraudulent Claims. Claims Administrator shall not bring suit to do so. Rather, it will advise Plan Sponsor of any instances that Claims Administrator believes warrant legal action, and Plan Sponsor shall decide on whether and by what means to bring and prosecute such action.

7.5     Claims Administrator will, on a periodic basis, reconcile all Claims Funding Contributions, or Premium, Claim Amounts, Administrative Fees and Expenses, and present Plan Sponsor with an actuarial review of its account. Any net differences due to either Party will be reconciled as part of the next invoice, or if there are no further invoices, after termination of this Agreement. If such reconciliation occurs after the termination of this Agreement, the owing Party will reimburse the other Party for such amount.

## 8. Late or Overdue Payments

8.1     If Claims Administrator does not receive Plan Sponsor's scheduled payments by the due date indicated on Plan Sponsor's invoices, Claims Administrator will suspend payment of claims for those dates of service for which payment was not received, and Plan Sponsor will be responsible for any late fees or interest incurred as a result of non-payment. Claims Administrator will assess an interest charge of 1.5 points above the Prime Rate taken from the Federal Reserve Statistical Release Form H.15 (519) on any amount overdue. This charge shall be assessed on each invoice until Claims Administrator receives the full amount due. Alternatively, in its sole and absolute discretion, Claims Administrator may terminate this Agreement as provided in Section 12.

## 9. Reports

9.1     In addition to the enrollment report specified in Section 5.5, Claims Administrator will provide Plan Sponsor with access to an electronic copy of a bi-weekly Claim listing. This Claims listing will include those total Claims that Claims Administrator has Paid in that specific month and year, as well Contributions for that period.

9.2     Upon request, Claims Administrator will provide cost utilization reports for benefit management at no additional cost to Plan Sponsor. Subject to Article 11, this Agreement does not provide for disclosure of other medical, Claims processing, or Claims payment data to Plan Sponsor or to any third party beyond that contained in the monthly Claims listing, except as may be reasonably necessary in connection with Plan Sponsor's role as final arbiter of Claims decisions.

9.3     Any examination of individual benefit payment records will be carried out in a manner agreed to between Plan Sponsor and Claims Administrator designed to protect the confidentiality of medical information in accordance with HIPAA

9.4     All documents relating to the payment of Claims shall be the property of Plan Sponsor, subject to Claims Administrator's right to possession and use during the continuance of this Agreement. Following termination of this Agreement, Plan Sponsor has the right, upon thirty (30) days advance written request, to have available documentation returned to it, at no cost.

9.5     Plan Sponsor will use any information Claims Administrator makes available solely for the purpose of administering the Plan. Plan Sponsor agrees to defend at its sole expense, indemnify and hold Claims Administrator harmless for any Claim, action, or loss that may arise at any time in the future out of Plan Sponsor's unauthorized use or release of this information. Furthermore, if Plan Sponsor uses the information for another purpose, Claims Administrator will consider that action a material breach of this Agreement. This Agreement will then be subject to

immediate termination. This provision will continue in effect after termination of this Agreement for any reason.

### 10. Audits

10.1   When Plan Sponsor disputes payments with respect to specific Claims, it has the right, within one (1) year after receipt of an invoice from Claims Administrator, during regular business hours, to review the supporting data. Requests for this information must be made to Claims Administrator in writing. Also, on an annual basis, Plan Sponsor has the right to request, at its own expense, a comprehensive audit of Claim payment records to assure that administration of the Plan is performed according to the terms of this Agreement and the Plan Document. These audits will be conducted only for Claims processed and filed within the previous two (2) years of the date the audit is requested and according to the audit procedures the Parties agree to prior to the start of the audit. The audit must use a statistically valid sampling approach based upon a 95% confidence level and +/-3% precision level. Confirmed errors identified in the audit will be promptly corrected on a Claim by Claim basis. Plan Sponsor is not permitted to use extrapolation methodologies, to calculate errors in a population of Claim payments on the basis of a sample drawn from that population. However, to the extent either party identifies any types of Claims which were paid incorrectly due to a common error, Claims Administrator will review and correct, as appropriate, all such Claims paid during the period being audited. "Audit procedures" as used herein shall not be interpreted to limit the materials to be examined in the audit. Any audit which was requested prior to the effective date of termination of this Agreement shall be performed.

### 11. Further Indemnification

11.1   Plan Sponsor agrees to defend at its sole expense, indemnify and hold Claims Administrator harmless against all Claims, including legal fees, judgments, administrative expenses, and benefit payment requirements, that may result at any time arising from or due to Plan Sponsor's failure to comply with the terms of the Plan Document, or any applicable laws or regulations, except where Plan Sponsor has informed Claims Administrator in writing prior to its payment that the Plan should have been the primary payer with respect to an employee entitled to Medicare and/or Medicaid benefits. This indemnification provision will continue in effect after termination of this Agreement for any reason.

11.2   Plan Sponsor agrees to defend, at its sole expense, indemnify and hold Claims Administrator harmless for any taxes and assessments, including penalties and interest related to such taxes and assessments, legally levied under the Internal Revenue Code based on the terms of this Agreement, other than based on Claims Administrator's income, unless Plan Sponsor notifies Claims Administrator that, in the opinion of Plan Sponsor's legal counsel (which opinion shall be final), such taxes and assessments have not been legally levied against the Plan. Plan Sponsor agrees to hold Claims Administrator harmless, and to indemnify Claims Administrator for any losses which result from its action taken in reliance upon Plan Sponsor's legal counsel's opinion on such matters. This provision applies to any amounts imposed, now or later, under the authority of any federal, state, or local taxing jurisdiction. This provision will continue in effect after termination of this Agreement for any reason. This indemnification shall not apply to any taxes and assessments, including penalties and interest, or any other amounts, which would not be payable had the Parties not made this Agreement.

11.3     Claims Administrator agrees to indemnify and hold harmless the Plan and Plan Sponsor and its directors, officers and employees against any loss, costs, liabilities and expenses (including, but not limited to, attorneys' fees and court costs) resulting from or in connection with any function Claims Administrator has undertaken, or which is required of Claims Administrator, pursuant to this agreement where it has been determined that the liability therefore was the result of its negligence, imprudence, willful misconduct, malfeasance, fraudulent acts, or breach of applicable law; provided, however, that Plan Sponsor shall remain liable for the payment of all Claims under the Plan. No termination of this Agreement shall reduce Claims Administrator's obligations under this provision.

## 12. Termination of This Agreement

12.1     If full payment of all amounts billed is not received by the due date indicated on each invoice, Claims Administrator will suspend all Claim payments. If full payment is not received within forty-five (45) days after the due date, Claims Administrator will terminate this Agreement on a date it chooses, but not earlier than the due date through which the required Contributions have been paid. Plan Sponsor must pay Claims Administrator for any balance Plan Sponsor owes Claims Administrator, including any late charges and interest.

12.2     This Agreement may be terminated immediately upon written notice for material breach, fraud, or misrepresentation, by either Party; provided however, that in the event of a material breach, if the breaching party cures the alleged breach prior to the proposed effective date of termination, the termination shall not become effective and this Agreement shall continue in full force and effect.

12.3     This Agreement may be terminated by either party, without cause, upon at least thirty (30) days prior written notice to the other party.

12.4     If this Agreement is terminated, Plan Sponsor will be liable for all Contributions due for periods prior to the date of termination; provided however, that Plan Sponsor may withhold the amount of any Administrative Fees in the event that this Agreement is terminated by Plan Sponsor for cause.

## 13. Choice of Law, Interpretation and Disputes

13.1     This Agreement shall be governed by and construed under the laws of the State of New York, without reference to its choice of law or conflict of law provisions, unless preempted under Section 514 of ERISA. The parties agree that any disputes arising under this Agreement shall be heard only before the federal courts located in the Eastern District of New York, and the parties shall not contest jurisdiction or venue thereof.

13.2     Both Parties have been represented by competent counsel and the terms of this Agreement are the result of arms-length negotiations, thus this Agreement shall not be construed against the drafter.

13.3     In the event of any dispute between the parties to this Agreement arising under its terms, the parties shall submit the dispute to binding arbitration under the commercial rules of the American Arbitration Association. Any arbitration arising under this Agreement shall be

11 | Page

conducted by one arbitrator whom the Parties shall select through the process established by the American Arbitration Association. The provisions of this Article shall not affect either party's right to terminate this Agreement, upon notice, when entitled to do so under the terms of this Agreement.

### 14. Notices

14.1   Notices under this Agreement shall be sent by overnight courier or certified mail, return receipt requested, or delivered by hand as follows:

To:   Leading Edge Administrators
      14 Wall Street, Suite 5B
      New York, NY 10005

To:   **The Providence Health Group**
      **121 S. Water Ave.**
      **Gallatin, TN 37066**

### 15. Amendments

15.1   This Agreement may be amended only by written agreement of both parties. A waiver of any breach of this Agreement will not be construed to be a continuing waiver for a similar breach. Such a waiver must be in writing and signed by authorized representatives of both parties to be effective.

### 16. Miscellaneous

16.1   This Agreement, including the rights and obligations of the Parties hereunder, shall not be assignable by either Party without the prior written consent of the other Party, and any attempted non-permitted assignment shall be void.

16.2   If the provisions of this Agreement are in any way inconsistent with the provisions of the Plan as set forth in the Plan Document, then the provisions of the Plan Document shall prevail and the other provisions shall be deemed modified, but only to the extent necessary to implement the intent of the Parties as expressed herein.

16.3   In the event any provision of this Agreement is finally adjudged to be invalid or unenforceable, all other provisions shall remain in full force and effect.

16.4   The rights and obligations of the Parties hereto shall survive the termination of this Agreement to the extent necessary to effectuate the intent of the Parties as expressed herein.

16.5   Notwithstanding any other provision of this Agreement, in the performance of the obligations of this Agreement, each party is at all times acting and performing as an independent contractor with respect to the other Party. It is further expressly agreed that no work, act, commission or omission of either Party (or any of its agents or employees) pursuant to the terms and conditions of this Agreement, shall be construed to make or render such Party (or any of its

agents or employees) an agent, servant, representative, or employee of, or joint venture with, such other Party.

16.6     Any provision of this Agreement to the contrary notwithstanding, neither party, nor any of its delegates, subsidiaries or representatives may use Claim Administrator's name or logo without its permission.

### 17. Merger of All Prior Agreements

17.1   This Agreement constitutes both parties' entire understanding and supersedes all prior representations and understandings, whether oral or written.

### 18. Counterparts

18.1   This Agreement may be executed in any number of counterparts by the authorized representatives whose signatures appear below. Each such counterpart shall be deemed an original and shall constitute one and the same instrument.

### 19. Ownership

19.1   Plan Sponsor acknowledges and agrees that all documents prepared by Claims Administrator pursuant to this Agreement are owned by Claims Administrator and are proprietary in nature.  Plan Sponsor further acknowledges and agrees that neither Plan Sponsor nor any of its delegates, representatives, agents or affiliates, may use such documents subsequent to the termination of this Agreement.

**Leading Edge Administrators**

By: _____

Title:_____

Dated:_____

_____

**The Providence Health Group**

By: _____

Dated:_____

Title:_____

13 | P a g e

## SCHEDULE "A"
## FINANCIAL TERMS

Group Name:     **The Providence Health Group**

Other subsidiaries added to the plan at a later date will be subject to the terms of this agreement unless specifically stated.

Agreement Term:     **December 1, 2017 to November 30, 2018**

**CONTRIBUTIONS**

Contribution payments from Plan Sponsor to Claims Administrator are divided into the following categories:

**CLAIM AMOUNTS**
Claims Administrator shall pay all Claim Amounts out of the bank account funded by Contributions and Payments as described in Sections 6 and 7, above.

**EXPENSES** In addition to all Claim Amounts paid, the following Expenses shall be paid to Claims Administrator.

**Network Access** – Claims Administrator will provide access to the CIGNA network. Network access fees are included in the administrative fees listed below.

**Stop Loss/Reinsurance Premiums** – all premiums for the stop-loss/reinsurance arranged by Claims Administrator to remit to the stop-loss carrier.

**Administrative & Broker Fees** – During the Initial Term, Administrative fees for Claims Administrator's provision of the services listed in Schedule "B" and shall be paid at $60.50 Per Employee per Month. Broker fees shall be paid at $20 Per Employee per Month. All fees shall be invoiced monthly by the Claims Administrator.

All Administrative and Broker Fees indicated above can be subject to revisions on the Anniversary Date.

**Early Termination:** Parties agree that LEA will incur significant costs building and staffing to service this plan. In the event that Plan Sponsor terminates this Agreement during the Initial Term for any reason other than Claims Administrator's breach, Plan Sponsor acknowledges and agrees that it is responsible for payment of the full amount of Administrative and Broker Fees due and owing for the remainder of the Initial Term. By way of example, if Plan Sponsor has 160 employees and terminates this Agreement effective May 31, 2018, Plan Sponsor agrees that it will be responsible for the payment of $77,280 ((160* $80.50)*6 months), such payment to be made within ten (10) calendar days of the effective date of the termination, such amounts to be prorated dependent upon the effective date of termination.

## TERMINATION AND RUN-OUT CLAIMS

Upon termination of the contract, Plan Sponsor can opt to retain services of Claims Administrator for the purpose of administering the run-out claims. The fee for the administration of run-out is the equivalent of 4 months of administrative fees and is calculated based on the average enrollment for the final 3 month period of the contract. Claims Administrator agrees to administer claims for up to 12 months after date of termination and has no obligation to administer claims submitted after the 12 month period has lapsed.

## SURPLUS FUNDS

All surplus monies not required to pay Claim Amounts or Expenses shall remain in the bank account funded out of Contributions, to be disposed of by Plan Sponsor in accordance with applicable law and regulation.

## FEES

Costs associated with operations of the Plan, Payable by Plan Sponsor on a monthly basis, unless otherwise noted.

*Administrative Fees.* All prices capitated on a Per Employee Per Month (PEPM) basis, unless otherwise noted:

| | |
|---|---|
| Medical Administration: | **$43.50** |
| Medical PPO Network Rental: | **$17.00** |
| Broker/Consultant Compensation: | **$20.00** |

| | |
|---|---|
| **TOTAL MONTHLY ADMINISTRATIVE FEE:** | **$80.50** |

*Shared Savings Fees.* Cost containment services billed on a contingency basis. No fees billed if no savings realized.

| | |
|---|---|
| Direct Negotiation of NonPar Claims | 30% of savings |
| Claims Integrity Service (forensic analysis of claims for provider error/fraud/waste/abuse) | 30% of savings |
| Wrap Network (obtain savings of nonpar claims not direct-negotiated) | 30% of savings |

## SCHEDULE "B"
## LIST OF ADMINISTRATIVE SERVICES

**Group Name:** The Providence Group

**Agreement Term:** December 1, 2017 to November 30, 2018

Claims Administrator will provide the following administrative services to Plan Sponsor.

### Account Services

- Account executive and team assigned to coordinate services;
- Designated customer service team available via telephone and email; Customer service hours will be Monday thru Friday (exclusive of legal Holidays) between 9 AM and 5 PM;
- Provide dedicated phone number for group;
- Plan design and underwriting services in connection with benefit revisions, benefit additions, and extension of coverage to new employees and their dependents;
- Development, maintenance, printing and distribution of Summary Plan Document and Benefit Summaries;
- Enrollment and eligibility verification and maintenance;
- Employee communications with distribution of applicable information;
- Issuance of standard ID cards;
- Verification to providers concerning coverage and benefits;

### Billing

- Training of Plan Sponsor staff to a level of self-sufficiency on billing processing system; and
- COBRA Administration – Leading Edge can handle COBRA administration at Plan Sponsor's discretion. Plan Sponsor will be responsible for cost of postage on all COBRA correspondence.

### Claims Management

- Access to the **Cigna** PPO network and its negotiated provider discounts;
- Payment of benefits and check preparation;
- Performance of internal audits of Claim payments on a random sample basis;
- Claim investigation as needed;
- Quality assurance procedures and review;
- Fraud control;
- Respond to Department of Labor inquiries;

- EOB vouchers provided directly to claimants;

## Medical Management

- Utilization Management (Precertification)

## Accounting and Financial Services

Customized financial reporting:
1. Utilization (Claims) reports
2. Plan P&L reporting for Overall performance
3. Detailed, electronic enrollment rosters available for review provided to support monthly billing
4. Detailed Claim listings

## Additional Services and Fees

- Periodic actuarial reviews of Plan Sponsor's account and development of actuarially certified COBRA rates. The cost of review will be billed to Plan Sponsor;

# SCHEDULE "C"

## PLAN BENEFIT DETAILS

See attached Plan Documents