UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
THE PROVIDENCE GROUPS, LLC,

                Plaintiff,

                -against-

OMNI ADMINISTRATORS INC. d/b/a LEADING EDGE
ADMINISTRATORS,

                Defendant.
-----------------------------------------------------------------------X

**DECLARATION OF AVRUMI FRIEDMAN**

Index No.: 20-CV-05067-FB-SJB

**AVRUMI FRIEDMAN** hereby declares the truth of the following, subject to the penalty of perjury and pursuant to 28 U.S.C. § 1746, as follows:

1.    I am the Director of Cost Containment at Omni Administrators, Inc. d/b/a Leading Edge Administrators ("**LEA**"). I submit this declaration in opposition to the motion for an Order to Show Cause (ECF No. 6-7) filed by Plaintiff, The Providence Groups, LLC ("**Providence**"), which seeks a Court Order:

> Directing LEA to provide a full accounting of its administration of the Providence health benefit plan, including a reconciliation of all funding provided by Providence, all claims paid, and all claims submitted to an (sic.) paid by the stop loss insurer for the plan, within fifteen days of the issuance of any order granting this application.[1]

**Background**

2.    LEA is a third-party administrator ("**TPA**") for self-insured health benefit plans that are sponsored by employers for the benefit of their employees. LEA has been in operation since 2010. LEA offers a wide array of options to employers who sponsor self-

---

[1] ECF No. 5

insured health care plans (known as "**Plan Sponsors**") as well as self-insured multi-employer plans to allow them to cost-effectively operate their plans. In this regard, LEA has relationships with a large number of the major national health care insurance networks (e.g., Anthem, Cigna, Multiplan, etc.), as well as regional networks, which offer self-insured plans access to their networks of physicians, hospitals and other healthcare providers associated discounts off of services.

3. In its claim administration, LEA utilizes proprietary auditing and claims processing technology and employs people with expertise in the field of health care to process claims for single-employer and multi-employer plans on a national basis. LEA's first client was a Taft-Hartley union benefit fund, with over 300 participating employers and seven plan designs, covering nearly 3,000 participant employees and their eligible dependents. In the ensuing decade, LEA's clients have grown to consist of almost one hundred self-insured entities, representing tens of thousands of employees in self-insured plans, in a wide range of businesses from educational institutions, to home furnishing manufacturers, environmental testing companies and home health care agencies.

4. While I was not personally involved in the beginning of the LEA-Providence relationship, based upon my review of LEA's records and conversations with employees, upon information and belief, on or about November 6, 2017, LEA made a proposal to Providence, who was seeking a solution for its employee benefit needs ("**LEA Proposal**"). Specifically, LEA sent a proposal for Providence to establish a self-funded health benefit plan. The LEA proposal *was based upon information that Providence provided to LEA.* In particular, Providence informed LEA that any potential self-funded plan for Providence would cover only one hundred twenty-six (126) employee/participants. The LEA Proposal

5018352.v1

offered a number of different options on how to structure the plan, a suggestion on what healthcare network would best serve the needs of Providence's employees based upon its location, a suggested stop-loss insurance carrier and a detailed list of the potential costs *based upon 126 participants.* A true and correct copy of the LEA Proposal is attached as Exhibit A.

5. On or about December 1, 2017, Providence officially converted its company health insurance plan from a fully insured health plan to self-insured health plan ("**Providence Plan**").

6. In furtherance of that effort, Providence retained LEA to serve as the TPA of the Providence Plan and, on or about November 8, 2017, LEA and Providence entered into an administrative services agreement ("**ASA**"). A true and correct copy of the ASA is attached as Exhibit B.

7. Shortly after the execution of the ASA, the Providence Plan was implemented pursuant to a plan design set forth in the master document known as the Summary Plan Description ("**SPD**"). The SPD governed the duties and responsibilities of Providence as the Plan Sponsor and set forth the eligibility and benefit provisions associated with participants enrolled in the Plan. The SPD detailed the manner in which Covered Services would be reimbursed under the plan, including the Plan and participant responsibility.[2] Stated more simply, the SPD establishes, among other things, what the participant's deductibles will be (for in-network as well as out-of-network providers), what their co-insurance will be and what the participant's out-of-pocket maximum payment will be. A

---

[2] Covered services are the care, treatments, services, or supplies eligible for payment or reimbursement from the Providence Plan.

3

true and correct copy of the SPD is attached as Exhibit C. (*See* Exhibit C Appendix which sets forth a chart identifying how the costs are to be allocated).

8. The SPD was prepared in draft by LEA for the benefit of Providence; however, the final approval of the SPD and its terms and conditions were solely and exclusively within the control of Providence.

### LEA's Role as Claims Administrator

9. As set forth in the ASA, LEA's role with respect to the Providence Plan was simply that of a claims administrator. LEA did not have final decision-making authority on the application of the terms and conditions of the SPD.

10. One of the considerations for the Plan Sponsor of a self-insured health care fund is stop-loss insurance. Stop-loss insurance is an insurance policy obtained by the Plan Sponsor to protect from unforeseen catastrophic claims. There are two forms of stop-loss coverage. First, stop-loss pays for individual claims on behalf of one participant if the claims for that individual in the plan year exceed a certain monetary limit, for example, in the event that a particular participant has a catastrophic medical issue that will require significant treatment. This is known as the "individual limit". Second, stop-loss pays reimbursement to a plan for all claims in a given plan year if the self-insured plan exceeds a pre-determined aggregate monetary limit for all participants. This is known as the "aggregate limit". These stop-loss trigger valuations are also known in the industry as "Attachment Points".

11. When LEA serves as a TPA of a self-insured health care plan, LEA obtains for the client a stop-loss insurance carrier. We obtain quotes for stop-loss insurance from carriers and the stop-loss insurers determine what the proposed Attachment Points will be. The stop-loss carrier tries to estimate, based upon prior claims experience (when available),

4

medical questionnaires completed by each potential plan participant and/or or actuarial calculations with respect to the anticipated plan participants age, gender, zip code and other factors. In this analysis the stop-loss carrier determines the maximum amount of money that likely will be required to cover all claims in the upcoming year. The stop-loss insurance carrier then takes one hundred twenty five percent of that value and the client obtains stop-loss insurance for any claims above that one hundred twenty-five percent number. When the stop-loss insurance contract rules are adhered to, the stop-loss insurance always works to minimize liability.

12. In this case, the stop-loss insurance carrier, US Fire Insurance Company ("**US Fire**"), determined the Attachment Points based upon medical questionnaires provided by Providence. This was information uniquely within the control of Providence. In short, US Fire calculated the Attachment Points and the premiums that would be required for that insurance for the first plan year of December 1, 2017 to November 30, 2018 ("**Year One**").

### The Administration of Claims Process for the Providence Plan

13. To understand LEA's role as the TPA, the Court must understand how the process by which LEA administered claims for the Providence Plan.

14. After the ASA was executed and LEA began acting as the TPA, LEA took the terms and conditions set forth in the SPD (as with its many other clients, all of which have different insurance programs) and inputted the plan specifications into its computer software. By doing this, LEA would be capable of processing claims electronically as they came in (e.g., application of deductible amounts, co-insurance, etc.).[3]

---

[3] In some unusual instances, certain claims must be adjudicated manually.

15. Separate from the ASA, Providence entered an agreement with the CIGNA healthcare network to gain access to a network of healthcare providers with whom CIGNA had a relationship and associated discounts from those providers. CIGNA contracts with those healthcare providers and negotiates fees for services at agreed upon rates. Providence agreed to pay a monthly fee to CIGNA (based on a set fee multiplied by the number of participants in the plan each month) for access to the CIGNA healthcare network for the members of the Providence Plan. By working through the CIGNA network, Providence was able to get the benefit of CIGNA's negotiated (and reduced) rates with health care providers located in the areas in which Providence operated its businesses and where its employees lived.

16. Each and every claim for a health care services provided to a participant and their eligible dependents was first sent by the provider of the health care service (*e.g.,* a doctor) to CIGNA. After the provider sent the bill for payment to CIGNA, CIGNA would then review the bill, determine if it was an in-network or out-of-network provider, cross-check it with its list of approved fees for that service, reprice the bill to the appropriate allowed amount and then send the bill electronically to LEA ("**CIGNA Bill**"). The CIGNA Bill sent to LEA noted a number of items, including: (1) the billed amount; (2) the allowed amount; (3) whether it was an in network or out of network provider; and (4) the diagnosis. This was most often done in batches with multiple claims for multiple participants sent on a given day to LEA.

17. Thereafter, when LEA received the CIGNA information, it would input that requested claim and payment information into its computer models. The LEA system would automatically account for what percentage of any particular invoice for health care services

was required to be paid by the participant by way of deductible and/or co-insurance or copay, and what amount was required to be paid by the Providence Plan directly. Additionally, and perhaps more importantly, the LEA system would keep track of the deductible and out of pocket maximum and determine what costs incurred for health care services were required to be paid entirely by the participant up until these limits were met.

18. By way of illustration, assume on November 1, 2017, the first day of Year One, an individual required a hospital visit for which the hospital billed CIGNA $15,000.00. CIGNA internally would then evaluate that claim and determine the permissible rate which CIGNA had previously negotiated with the health care provider. After CIGNA determined the appropriate payable rate, it would pass that claim on to LEA for processing and payment. Assume for the sake of this example that the permissible rate as per CIGNA's rate schedules was $10,000.00 for that service, LEA would receive the CIGNA bill for the $10,000.00. LEA would then input all the relevant information into its system and prepare an explanation of benefits ("**EOB**"). The EOB would set forth the amount owed by the participant (in this case, $5,000 for the deductible and $1,000 for 20% of the co-insurance). LEA would then electronically send to the provider and the participant that EOB explaining the amount the Providence Plan owed ($4,000) and the amount the employee owed $6,000.[4] (Exhibit B, Appendix (SPD)).

19. In short, LEA's claim processing was nothing more than administrative work – applying the repriced bills it received from CIGNA to the terms of the Providence Plan set

---

[4] This was generally done in batches; in other words, LEA in most instances did not send an individual request for each individual claim one at a time.

7

forth in the SPD and determining which party owed what amount, i.e., either the participant or the Providence Plan. Its function was purely mechanical.

20. On a periodic basis, LEA would send an electronic report to Providence informing Providence what its responsibility was, and Providence was required to fund the paid claims so that LEA could, in turn, make the payment. LEA was responsible for issuing the checks and sending the payment, but it could only do so once Providence funded the claim. In fact, the ASA specifically noted that, "[LEA] shall not be obligated to disburse more in Claims payment under this Agreement than the Plan Sponsor shall have made available for the purpose of payment of Claims, unless required to do so by law or Court Order." (Exhibit A, Sec. 1.1(b)).

21. LEA had no independent discretionary authority to approve or to deny claims. This was all dictated by the SPD. More importantly, LEA could not pay claims if it did not have money on account for the Providence Plan.

22. Finally, with respect to the stop-loss insurance, when the individual limit of a particular participant was met or when the aggregate limit was met, LEA would notify the stop-loss carrier of the same and the stop-loss carrier would be required to meet its obligation for payment.

23. I have read the Complaint filed in this matter. I understand that Providence asserts that under ERISA, 29 U.S.C. § 1002(21), LEA was a fiduciary under the Plan. This is incorrect. In making this claim, Providence relies on Section 4.2 of the ASA, which states:

> Plan Sponsor hereby delegates to [LEA], and/or its subcontractors, authority to make initial Claims determinations on Plan Sponsor's behalf with respect to Claims for benefits under the Plan. [LES's] administration shall be in compliance with all applicable laws including, but not limited to ERISA, ACA and HIPAA.

8

24. I note that Providence has omitted the preceding (and more important) section of the ASA, specifically, Section 4.1, which states (emphasis added):

> *Plan Sponsor [i.e. Providence] will be responsible for complying with all applicable provisions of [ERISA], as amended. This includes the fiduciary responsibilities of establishing and structuring the Plan, maintaining adequate funding to support the Plan and making all final Claims decisions.* Claims Administrator will be responsible for developing, maintaining, printing, and providing to Plan Sponsor and its covered employees copies of the Plan Document describing the Plan, and copies of a summary brochure of benefits, limitations, exclusions, and waiting periods. Claims Administrator will also be responsible for administering Claims as set forth in 4.2, below.

25. Additionally, the ASA specifically noted that "*Plan Sponsor* [i.e. Providence] shall be deemed a 'fiduciary' for the Plan within the scope of this agreement and within the meaning of ERISA and [Providence] shall have discretionary authority and final determinative capability where [Providence] has so delegated such responsibilities." (Exhibit A (ASA, Wherefore Clauses (emphasis added)). Nothing in the ASA identifies LEA as a fiduciary because *LEA was not a fiduciary in its capacity as the TPA*.

26. To be clear, and as set forth above, the only "authority to make initial Claims determinations" given to LEA under the ASA was to intake the claim as sent by CIGNA, evaluate whether the participant's deductible had been met, determine the appropriate co-insurance and/or copay owed, determine if the stop-loss had been triggered and send a report to Providence advising it of the amounts to be funded so that LEA to could pay the claim.

27. As the TPA, LEA's responsibility is to only pay claims that conform to the SPD and CIGNA network rules. For example, if a claim was billed missing a procedure code, or an authorization was missing, or there is a possibility there is a different insurance

9

that should be responsible for the claim, or there is the potential that the claim doesn't conform with one of the SPD guidelines, such as meeting medical necessity, LEA will apply the SPD guidelines or the CIGNA guidelines, deny the claim and request additional information from the provider and/or the participant. However, at the end of the day, the ultimate "authority" to approve or deny any claim lies with the sponsor and fiduciary, Providence.

28. The Providence Plan started on December 1, 2017 and the claims incurred by the participants were higher than projected and the monthly costs increased quickly. The reasons for this might have been many factors. For example, although LEA Proposal accounted for the enrollment of one hundred twenty-six (126) members, in fact, many additional members were enrolled after December 1, 2017. For example, by January 2018, Providence had approximately two hundred fifty (250) participants on the Providence Plan.

29. Not surprisingly, the costs per month to Providence for the services and claims are directly related to the number of participants. For example, the stop-loss carrier charges an additional monthly premium for each additional participant, LEA charges an additional monthly premium for each additional participant and CIGNA charges an additional fee for each additional participant. These are fixed costs per participant, the more participants, the higher the cost. In addition, the greater the number of participants, the higher the likelihood of additional medical claims costs. The Aggregate Attachment Point is directly related to the number of plan participants, so the maximum liability increases as well.

30. By the end of the first year, LEA was sounding the alarm bells about the costs being incurred by Providence and its failure to make payments for the same. For example,

in November 2018, before Year One had expired, LEA informed Providence of the substantial shortfalls by way of both emails and telephonic communications.

31.     It is worth noting that, on behalf of Providence, in our capacity as TPA, we advocated aggressively with the stop-loss carrier, US Fire, to make sure that Providence received the maximum contributions from US Fire to cover the overages beyond the Attachment Points.  In particular, we recovered over $720,000 for claims made to the Providence Plan beyond the individual limit and over $200,000 for claims to the Providence Plan beyond the aggregate limit for Year One.  We protected our client.

32.     The second year of the Providence Plan was scheduled to be December 1, 2018 to November 30, 2019 ("**Year Two**").  Based upon the Year One claims, the stop-loss carrier recalibrated the potential costs to the Providence Plan that could be anticipated for Year Two.  To be clear, this was not a determination made by LEA.  LEA did not make that determination, US Fire did.  LEA has no incentive to underestimate costs or otherwise artificially lower the sum that our clients should anticipate their self-insured plan will cost. LEA is paid a flat fee per participant for its services.

33.     In Year Two, as with Year One, on a regular basis, week in and week out, LEA was receiving CIGNA Bills, processing claims on behalf of the Providence Plan and regularly sending bi-monthly reports to Providence representatives for claims LEA has processed to pay.  LEA would also regularly sent a report including the amounts that needed to be funded by Providence to satisfy all of the outstanding claims.

34.     By May 2019, again, Providence had fallen far behind in its obligations to make payments for claims despite LEA's regular communications advising them to do so. At that time, LEA informed Providence of a shortfall of approximately $315,000.  There

11

were numerous emails and teleconferences explaining the issues and problems and what money was owed, to whom and why. Providence was consistently confused as to where and how the funds were applied and why there was a shortfall. Representatives of LEA had multiple reconciliation exercises with Providence staff and/or the Providence broker. Providence was informed repeatedly of the fact that they were behind on payments, not only by LEA, but also by Providence's broker.

35. Providence seemed consumed with the fact that they had funded the Providence Plan up to the Attachment Point and, therefore, no further money should be owed. However, this is a fundamental misunderstanding of the process. As we explained to them repeatedly, there are a multitude of reasons why more money beyond the individual or aggregate Attachment Point might be required. For example, as explained above, if the number of members increased during the plan year then the Attachment Point predicted at the beginning of the year will increase, thus the maximum claims liability on the Aggregate will increase. Additionally, all fixed costs will increase as enrollment increases. This includes the LEA administrative fee, the CIGNA Network fee and the stop-loss insurance premium. There are also limitations in the stop-loss contract that affect reimbursement, most significantly, claims must be incurred, processed and paid within the contract period. If the claim was not paid within the time frame stipulated in the Stop Loss contract, Providence would not be entitled to reimbursement. This happened on several occasions; however, it was not because LEA failed to inform Providence of the required payments; instead, it was because despite our notice and warning *Providence repeatedly failed to tender the requested payment.*

36. On May 29, 2019, Rachel Kamau – a principal at Providence – sent an email indicating Providence had no money on hand to fund the overdue claims. She complained that when Providence budgeted the claims at the beginning of Year Two, they collected the money from their locations based solely on the Attachment Point values and there was no more cash available and no way to secure it. Providence flatly admitted that they mismanaged their own finances, which lead to a cash shortfall and an inability to meet their obligations for the claims.

37. In or about mid-July 2019, Providence decided to terminate their plan early, effective August 31, 2019. Providence transferred back to a traditional insurance carrier effective September 1, 2019. When the Providence Plan was terminated, not all claims incurred prior to August 31, 2019 had been resolved. As a result, Providence retained the responsibility for the processing and eventual payment of claims that were incurred prior to August 31, 2019. These post-close claims processing needs are referred to in the industry as "run-out" services.

38. Providence requested LEA to remain as the TPA for the following twelve-month period (i.e. from ,September 1, 2019 to August 31, 2020) to process the run-out claims. LEA agreed to do so for one quarter of the fee that it would have charged had the Providence Plan remained operational for that period.

39. In the ensuing year, LEA had *repeated* phone calls and emails with Providence representatives in an effort to resolve all of the outstanding claims owed to providers for services provided in Year Two. Time and time again, we sent reports, had teleconferences and explained what was owed and why. *This money is not going into the pocket of LEA*. These are fees that are owed to health care providers. We explained what

13

was needed to be paid immediately, however, despite our instructions, Providence failed to supply LEA with the money to make the payments. We explained all of this over and over, but they still did not make payment.

40. After months and months of Providence failing to provide the funds to pay the outstanding run-out claims for Year Two, by way of letter dated July 17, 2020, LEA informed Providence that it was terminating the LEA-Providence relationship effective June 15, 2020.

41. Nevertheless, despite the fact that LEA terminated the relationship effective June 15, 2020, on or about July 17, 2020, Providence requested additional information. On or about July 24, 2020, I personally provided a second detailed claims listing spreadsheet to Providence explaining that these were both the previously processed claims that were not funded as well as unprocessed claims (this is the spreadsheet about which Providence now complains in the Complaint).

**The Instant Lawsuit**

42. In or about October 23, 2020, I was made aware of this lawsuit. I have read the Complaint and categorically deny the allegations made therein as against LEA. The idea that LEA failed and refused to cooperate with Providence is absurd. We bent over backwards to assist Providence in all respects. Providence, however, just did not understand the situation it had placed itself in by not appropriately monitoring and managing its own self-insured health care fund despite all of our advice and guidance.

43. Although we are no longer the TPA to the Providence Plan, at the request of counsel, in a further effort to satisfy Providence's never-ending demands, *again* LEA

14

prepared another spreadsheet setting forth the unpaid claims. LEA personnel had to spend more than fifty hours preparing this information despite the fact that LEA is no longer the TPA and is not getting remunerated for these services. All of this information was previously provided to Providence on a rolling basis in different formats. We have now prepared and produced one integrated document that sets forth all of the information relevant to the remaining unpaid claims. This new excel spreadsheet, which is comprised of forty-three columns and three thousand three hundred forty-eight lines, includes all of the information that Providence could possibly need regarding the payments it never made. To be clear, this information was previously provided, but we have now made it abundantly clear in a detailed, unified document what the Providence Plan owes for unpaid claims. Among other things, the new spreadsheet set forth the unpaid claim numbers (Column C), the social security number of the participant (Column L), the participant name (Column D), the patient name (Column N), the health care provider number (Column AP), the health care provider address (Columns AJ -AO), the bill amount (Column U), the date received (Column A), the amount of payment allowed (Column V), the service dates (Columns S and T), the PPO claim number (Column M) and the employee co-pay responsibility (Column W). The new spreadsheet makes abundantly clear what provider is owed what amount for the claims unpaid and takes into account the individual plan participant's deductible, co-pay and co-insurance obligations. We should not be required to do more. We have gone above and beyond our obligations under the ASA.

44.     Contrary to the claims in the Complaint, LEA (a) properly administered the Providence Plan as required by the ASA, (b) maintained all proper records as required by the ASA and federal law and regularly provided those records to Providence, (c) reported on

15

5018352.v1

financial matters relevant to all claims made by Providence Plan's participants, (d) provided all claims support, (e) provided all services under the ASA in a timely and workmanlike manner and (f) paid all claims on behalf of the Providence Plan participants *when we were given the funds to* do *so by Providence.* LEA is not an insurance company. We did not provide stop-loss insurance. That insurance was provided by US Fire to Providence and the Attachment Points were all determined by US Fire.

45. If Providence has lost either: (a) the benefit of the reduced provider rates under the CIGNA network or (b ) the right to seek reimbursement from US Fire, that is through no fault of LEA. This is a direct result of Providence's failure to pay the claims timely as we repeatedly advised and requested them to do through regular reconciliation reports along with requests for funds. LEA has been operating as a TPA administering hundreds of health plans for a decade. We process and adjudicate

5018352.v1

claims for *tens of thousands* of self-insured fund members every *month*. We do our job effectively and proficiently. We in no way mismanaged the Providence Plan.

FURTHER YOUR AFFIANT SAYETH NOT

_____
Avrumi Friedman, November 6, 2020

17

5018352.v1