UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
:
THE PROVIDENCE GROUPS, LLC, and THE : Case No. 1:20-cv-05067-FB-SJB
PROVIDENCE HEALTH GROUP, LLC :
:
Plaintiffs, :
:
v. : **FIRST AMENDED**
: **COMPLAINT**
OMNI ADMINISTRATORS INC. d/b/a/ LEADING :
EDGE ADMINISTRATORS, :
and :
:
GCG FINANCIAL, LLC, :

Defendants.

-------------------------------------------------------------------- X

Plaintiffs, The Providence Groups, LLC and The Providence Health Group, LLC (collectively referred to herein as "Providence"), by and through the undersigned counsel, and for their First Amended Complaint against Defendants Omni Administrators Inc. d/b/a Leading Edge Administrators ("LEA") and GCG Financial, LLC ("GCG") hereby allege as follows:

## NATURE OF ACTION

1. This is an action involving claims under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq. ("ERISA"), as well as state law claims for fraudulent misrepresentation, negligence, breach of contract, indemnification, and specific performance.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this case pursuant to 29 U.S.C. § 1132 and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiff's remaining state law claims pursuant to 28 U.S.C. § 1367.

3.     Venue is proper in this District as to LEA pursuant to the contractual agreement of the parties.  Venue is proper as to GCG pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1132(e)(2).

## THE PARTIES

4.     The Providence Groups, LLC, is a Tennessee limited liability company with its principal place of business located at 110 Glancy Street, Suite 114, Goodlettsville, Tennessee 37072, and is an "employer" as defined in ERISA § 3(5).

5.     The Providence Health Group, LLC, is a Tennessee limited liability company with its principal place of business located at 110 Glancy Street, Suite 114, Goodlettsville, Tennessee 37072.

6.     The Providence Groups, LLC, and The Providence Health Group, LLC, are both 100% owned solely by Douglas P. Cox, an individual resident of Tennessee and are interrelated entities.

7.     LEA is an entity operating and existing under the laws of New York with its principal place of business at 14 Wall Street, Suite 5B, New York, New York 10005.

8.     GCG is an entity operating and existing under the laws of Illinois with its principal place of business at Parkway North Blvd, Unit 500, Deerfield, IL 60015.  GCG is a foreign limited liability company authorized to conduct business in the state of New York and may be served at 80 State Street, Albany, New York 12207.

9.     Plaintiff will serve a copy of this Complaint upon the Secretary of Labor and the Secretary of the Treasury by certified mail pursuant to 29 U.S.C. § 1132(h).

## FACTS RELEVANT TO ALL CLAIMS

10. Providence is a conglomerate of senior living facilities around the country, each owned and/or controlled by Douglas P. Cox ("Cox"), a resident of Tennessee. Up until 2017, some of the individual entities owned by Cox were offering fully-insured employee health benefit plans for their employees and their dependents. At that time, there were six separate facilities owned and/or controlled by Cox.

11. In approximately December 2017, four entities entered into management contracts with Providence whereby Providence agreed to provide staffing and management services.

12. In 2017, Providence consulted GCG regarding potentially moving to one self-insured employee benefit plan to include all entities within the Providence group and those entities being managed by Providence, instead of having separate fully-insured plans. Linda Tarpo, an insurance broker with GCG, had worked with some of the Providence entities in the past and was familiar with the corporate structure of Providence.

13. At the request of Linda Tarpo, LEA presented its proposal to Providence on or about November 6, 2017, to serve as third party administrator ("TPA") and to administer the self-insured plan (the "Plan") with an effective date of December 1, 2017.

14. The Plan, as proposed by LEA, was to be self-insured by Providence with stop loss insurance. The stop loss insurance would pay any individual claim above $75,000 ("specific limit") and the aggregate of all claims if the total claims for the Plan year (excluding any specific claims previously paid) exceeded $1,043, 215 ("aggregate limit"). The stop loss contract for 2017 was on a 12/12 basis.

15. The Plan was to be funded through Providence's deduction of certain amounts from employee wages as well as employer contributions from Providence and the related entities

3

managed by Providence rather than pay premiums to an insurance company and allow the insurance company to accept the risk. The goal of moving to a self-insured plan was to lower total health plan expenditures.

16. In the "Health Benefit Proposal" issued by LEA to Providence on November 6, 2017 ("2017 LEA Proposal"), LEA estimated the "Maximum Total Plan Cost" (125% of expected claims) to be $844,493. This amount included fixed costs (stop loss premiums plus administrative fees and the anticipated health and pharmacy claims) and was presented by LEA as the "worst case scenario" for the amount of money Providence would need to pay to fund claims for participants for the Plan year beginning December 1, 2017, and ending November 30, 2018. Stop-loss insurance, would be responsible for the claims above the "worst case scenario."

17. In reliance upon the 2017 LEA proposal and advice from GCG, Providence established the Plan to provide health insurance coverage to its employees.

18. In further reliance on the 2017 LEA Proposal, Providence began funding the Plan with the necessary employer and employee contributions as determined by LEA.

19. As part of the establishment of the Plan, Providence entered into an Administrative Services Agreement with LEA as of December 1, 2017 (the "Agreement"), whereby, among other things, LEA agreed to serve as TPA for the Plan. The term of the Agreement was December 1, 2017, through November 30, 2018 (the "2017 Plan Year").

20. As of December 1, 2017 and pursuant to the Plan and ERISA, 29 U.S.C. §1002(16)(B), Providence was the named Plan Sponsor.

21. Pursuant to the Agreement, and under ERISA, 29 U.S.C. § 1002(16)(A), LEA was delegated the duty to make initial claims determinations and to comply with ERISA requirements.

22. Section 4.2 of the Agreement provides that:

> Plan Sponsor hereby delegates to Claims Administrator, and/or its subcontractors, authority to make initial Claims determinations on Plan Sponsor's behalf with respect to Claims for benefits under the Plan. Claim Administrator's administration shall be in compliance with all applicable laws including, but not limited to ERISA, ACA and HIPPA.

23. Pursuant to Section 4.3 of the Agreement, LEA was also to perform its duties using "the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use …."

24. Pursuant to the Agreement, LEA also agreed to indemnify Providence for certain liabilities and losses that Providence may incur or suffer as a result of LEA's misconduct.

25. Section 4.6 of the Agreement provides as follows, in relevant part:

> The Claims Administrator will indemnify, defend and hold the Plan Sponsor and its respective directors, officers and employees harmless from and against any and all claims, suits, actions, liabilities, losses, fines, penalties, damages and expenses of any kind including, but not limited to court costs and attorney's fees, which Plan Sponsor may suffer or incur as a result of any dishonest, fraudulent, negligent, or criminal act or omission of the Claims Administrator or its employees …

26. Section 11. 3 of the Agreement provides as follows:

> Claims Administrator agrees to indemnify and hold harmless the Plan and Plan Sponsor and its directors, officers and employees against any loss, costs, liabilities and expenses (including, but not limited to, attorneys' fees and court costs) resulting from or in connection with any function Claims Administrator has undertaken, or which is required of Claims Administrator, pursuant to this agreement where it has been determined that the liability therefore was the result of its negligence, imprudence, willful misconduct, malfeasance, fraudulent acts, or breach of applicable law; provided, however, that Plan Sponsor shall remain liable for the payment of all Claims under the Plan. No termination of this Agreement shall reduce Claims Administrator's obligations under this provision.

27. LEA was also required, per the Agreement, to handle the administration of stop loss insurance coverage for the Plan by timely submitting all claims to the stop loss insurer, U.S. Fire

Insurance Company, in order for Providence (or the Plan) to be reimbursed for medical claims that exceeded the specific and aggregate claims deductibles under the Plan.

28. Beginning in December of 2017, LEA began processing claims for Providence. LEA would send Providence separate invoices for the medical and prescription claims of each senior living facility, as well as separate invoices for administrative fees for each location. Providence would then total the invoices and send one wire payment for the total.

29. At some point early in 2018, LEA claims that it sent invoices that were not paid by Providence. Because the invoices were allegedly not paid, there were insufficient funds to pay all claims processed and LEA began applying amounts wired to it to random claims. This caused enormous confusion going forward to as to what was owed and what claims should be paid because the invoices sent from LEA were not correlated with the funds being sent in by Providence.

30. LEA's request for additional funding was not consistent with Provident's understanding of the Plan. Providence maintained that it had paid all the necessary invoiced amounts and sought further reports from LEA in order for it to determine the correct recordkeeping.

31. From the outset of the Agreement, Providence and its broker at GCG requested reports regarding the Plan's funding but was only provided piecemeal, confusing and misleading information. This was due in part to LEA's practice of misapplying funds received from Providence to the wrong claims, or even applying those funds to administrative costs instead of claims.

32. Due to the lack of information or receipt of misinformation, Providence did not have a clear understanding of whether or not its claims were properly funded. It relied upon the rates set by LEA and trusted that the collected amounts were sufficient to cover those claims.

33. On or about September 13, 2018, GCG, with LEA's input, presented Providence with a proposed renewal ("2018 Proposal") for the Plan.

34. The 2018 Proposal showed Providence's total claims through August 31, 2018, to be approximately $500,000.

35. GCG and LEA represented in the 2018 Proposal that, "Providence Group has saved an estimated 17% under the current medical funding arrangement compared to staying fully insured for the 2017-18 plan year."

36. GCG and LEA also represented that the Total Maximum Liability for the 2017-2018 Plan Year was $1,727,027. At the time of that representation, LEA knew, and GCG should have known, that the claims incurred during the first nine months already exceeded the "Total Maximum Liability," as represented by LEA and GCG.

37. The information presented by GCG and LEA in the 2018 Proposal to Providence was false and grossly inaccurate. In fact, the Plan had incurred claims exceeding $1,700,000 in the first nine months of the Plan year. This amount does not include the fixed costs for the Plan such as administration, stop loss premium and broker fees – which exceeded $600,000 per year.

38. Due to the misleading information being provided to it, Providence believed that its claims were adequately funded for the 2017 Plan Year. Therefore, Providence relied on the representations made by GCG and LEA in the 2018 Proposal in deciding to renew the Plan for the 2018 Plan Year.

39. Providence did not discover that the information provided in the 2018 Proposal was grossly inaccurate until after this litigation was instituted.

40. Had GCG and LEA provided accurate data in the 2018 Proposal, Providence would not have renewed the Plan.

41. In November 2018, approximately 78 days after the 2018 Proposal was made to Providence, LEA deposited $900,000 of its own funds into Providence's account in order to fund claims. This was done in order to be able to bill the stop loss insurer for claims exceeding the aggregate attachment point.

42. On December 31, 2018, LEA removed the $900,000 in funds from the account.

43. Upon information and belief, LEA began using funds invoiced and paid by Providence after that date to fund those aging claims that had previously been "covered" by LEA's $900,000 contribution to the Plan's assets.

44. Due to ongoing issues with LEA's refusal to provide accurate and decipherable claim information and its delay in paying claims and GCG's negligent consultation with regarding to renewing the Plan, Providence terminated the Plan (and the Agreement) early, effective as of August 31, 2019, and went to a fully insured health plan three months prior to the end of the 2018 Plan Year.

45. Over the course of the Agreement between Providence and LEA, which spanned a total of 21 months, Providence, at LEA's direction, funded the Plan with approximately $2,901,495.04 in employer and participant contributions.

46. Since Providence exercised its right pursuant to Section 12 of the Agreement to terminate the Agreement three months prior the end of the 2018 Plan Year, the Plan only incurred claims on a self-insured basis from December 1, 2018, through August 31, 2019 during the 2018 Plan Year.

47. Based upon information provided by LEA, the amount of employer and employee contributions to the Plan during the 2018 Plan Year should have nearly covered the amount necessary to pay all claims incurred by the self-insured Plan through August 31, 2019.

48. As of September 1, 2019, the Plan was fully insured and Providence was no longer directly liable for self-insuring the Plan claims and the risk of funding claims was transferred to an insurance company.

49. From September 1, 2019, through November 30, 2019, Providence paid approximately an additional $90,000 for run out claims (claims incurred but not received prior to the termination of the arrangement with LEA). The run-out period terminated as of November 30, 2019, and the substantial majority of the run-out claims should have been resolved during this time.

50. Pursuant to its rights under the Agreement and under ERISA, Providence requested information from LEA on multiple occasions to support the amounts that were being required to fund the Plan because the amounts were substantially higher than what was stated in the 2018 Proposal.

51. Pursuant to its rights under the Agreement and under ERISA, Providence further requested information from LEA regarding which claims had been paid and when, including the total claims outstanding and the amount allowed under the terms of the Plan. Providence needed this information in order for it to process outstanding claims based on the Plan discounts and the total employee responsibility.

52. This delay in providing updated claims data was unreasonable and inexplicable because the run-out claims period had ended November 2019.

53. Finally, LEA sent an Excel spreadsheet in July 2020 (the "July 2020 Spreadsheet"), which included most of the information requested, but which, critically, still did not reflect the amount of each claim for which the patient was responsible for payment or the deductible incurred by the participants in the Plan.

9

54. Without having complete information regarding outstanding claims, Providence was unable to determine the correct amounts owed. As a result, several claims remain unpaid and medical providers are now seeking payment from the employee participants.

55. The information provided in the July 2020 Spreadsheet reflected that LEA has mismanaged Plan claims and breached the terms of the Agreement. For example, one of the claims included on the July 2020 Spreadsheet reflects a claim service date of December 12, 2017. LEA received the claim in April 2018. According to LEA, the amount allowed under the Plan for this claim is approximately $46,000.00, and the claim should have been filed with the stop-loss carrier during the 2017 Plan Year. By failing to process this claim in a timely fashion, LEA caused Providence to remain liable for it, even though it should have been paid by the stop-loss carrier.

56. Upon information and belief, LEA has mismanaged numerous similar Plan claims.

57. LEA has failed and refused to do the following in violation of its obligations pursuant to the Agreement and ERISA: (1) provide timely and accurate accounting and financial information, (2) process claims, (3) pay medical claims timely, and (4) to account for stop loss payments received. As a result of its inaction, Providence and/or Plan participants are now left responsible for these medical expenses.

58. Upon information and belief, LEA received reimbursements from the stop loss insurer for certain medical claims and used those funds to pay other Plan claims that it had failed to process in a timely manner.

59. Furthermore, due to LEA's delay in processing claims, Providence was deprived of its stop loss coverage for certain claims, which in turn led to Providence being left to fund claims that otherwise would have been covered by its stop loss insurer.

60. Finally, LEA has continuously acted dilatory in managing claims and has failed and refused to provide claim information to Providence in a timely manner.

## SPECIFIC CAUSES OF ACTION

## COUNT I

### FRAUDULENT MISREPRESENTATION (GCG AND LEA)

61. Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

62. GCG and LEA misrepresented to Providence the claims data presented in their 2018 Proposal.

63. GCG and LEA knew that the information they provided to Providence was false.

64. GCG and LEA intended for Providence to rely upon the false information provided in the 2018 Proposal and, in fact, induced Providence to rely upon the false information.

65. Providence justifiably relied upon the false information presented by GCG and LEA in the 2018 Proposal when it decided to renew its self-insured Plan for the 2018 Plan Year.

66. Providence suffered monetary damages as a result of the false information provided by GCG and LEA in that, by renewing its 2018 Plan, it was required to pay more for claims than it would have had it converted to a fully insured plan.

## COUNT II

### NEGLIGENT MISREPRESENTATION (GCG AND LEA)

67. Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

68. Providence engaged the services of GCG and LEA such that there was a special privity of relationship, thereby imposing a duty on both GCG and LEA to impart correct information to Providence.

69. GCG and LEA imparted information to Providence in the 2018 Proposal that was incorrect.

70. Providence justifiably relied upon the incorrect information presented by GCG and LEA in the 2018 Proposal when it decided to renew its self-insured Plan for the 2018 Plan Year.

71. Providence suffered monetary damages as a result of the inaccurate information provided by GCG and LEA in that, by renewing its 2018 Plan, it was required to pay more for claims than it would have had it converted to a fully insured plan.

## COUNT III

## NEGLIGENCE (GCG AND LEA)

72. Plaintiff realleges and incorporates by reference the foregoing paragraphs as if set forth fully herein.

73. LEA held itself out as a capable third-party administrator with extensive knowledge and expertise in the area of claims administration.

74. Under the Agreement and otherwise, LEA owed a duty of care to Providence to "use the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in the conduct of an enterprise with like character and with like aims."

75. LEA owed a duty of care to Providence to provide accurate claims data in the 2018 Proposal for the renewal of Providence's Plan for the 2018 Plan Year.

76. LEA breached this duty by providing inaccurate and misleading claims data in the 2018 Proposal.

77. LEA further owed a duty of care to Providence to provide timely and accurate claims administration and payment and to provide claims information to Providence in a timely and accurate manner.

78. LEA breached its duty to Providence by failing to process medical claims in a timely manner and by misapplying funds received to unrelated claims.

79. LEA further breached its duty to Providence by failing and refusing to provide accurate claims data, even when requested by Providence and its broker on multiple occasions.

80. As a direct and proximate result of LEA's negligence, Providence has incurred damages due to LEA's failure to process claims as they were received. Providence was unable to bill claims to its stop loss insurance carrier to cover claims in excess of the specific and/or aggregate minimum claim amount. Therefore, Providence has suffered damages in that it has been required to fund claims that would have otherwise been covered by its stop loss policy.

81. GCG held itself out as a capable insurance broker with extensive knowledge of establishing, maintaining and funding self-insured plans, as well as the provision of stop-loss insurance.

82. GCG owed a duty of care to Providence to provide accurate information regarding the status of the Plan and its funding status.

83. GCG breached its duty to Providence by presenting inaccurate information in the 2018 Proposal and by advising Providence to renew its self-insured Plan.

84. As a direct and proximate result of GCG's negligence, Providence suffered monetary damages because, had it known of the inaccurate information in the 2018 Proposal, Providence would have not renewed for the 2018 Plan Year.

## COUNT IV

## BREACH OF CONTRACT (LEA)

85. Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

86. In 2017, Providence entered into the Agreement which required LEA to administer the Plan for the benefit of the Plan and Plan participants.

87. LEA breached the Agreement with Providence in several ways, including, but not limited to, by failing to:

    a. administer the Plan (Section 4.1 of the Agreement);

    b. provide appropriate coverage (Schedule B of the Agreement);

    c. maintain and provide proper records (Sections 9.1, 9.4 of the Agreement);

    d. provide reporting on financial matters relevant to claims made by Providence's Plan participants and funding for the Plan (Sections 9.1, 9.4 of the Agreement);

    e. provide claims support to Providence and its employees (Schedule B of the Agreement);

    f. provide a comprehensive audit of claim payment records (Section 10 of the Agreement);

    g. provide services pursuant to the Agreement in a timely, workmanlike manner and in accordance with the generally accepted standards for plan administrators (Schedule B of the Agreement); and

    h. to pay the claims of Providence's employees (Schedule B of the Agreement).

88. As a direct and proximate result of LEA's breaches, Providence has been and will continue to be damaged in that it has been and will be required to pay claims that would have otherwise been covered by its stop loss insurer.

## COUNT V

## INDEMNIFICATION (LEA)

89. Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

90. Section 4.6 of the Agreement provides as follows, in relevant part:

> The Claims Administrator will indemnify, defend and hold the Plan Sponsor and its respective directors, officers and employees harmless from and against any and all claims, suits, actions, liabilities, losses, fines, penalties, damages and expenses of any kind including, but not limited to court costs and attorney's fees, which Plan Sponsor may suffer or incur as a result of any dishonest, fraudulent, negligent, or criminal act or omission of the Claims Administrator or its employees …

91. Section 11. 3 of the Agreement provides as follows:

> Claims Administrator agrees to indemnify and hold harmless the Plan and Plan Sponsor and its directors, officers and employees against any loss, costs, liabilities and expenses (including, but not limited to, attorneys' fees and court costs) resulting from or in connection with any function Claims Administrator has undertaken, or which is required of Claims Administrator, pursuant to this agreement where it has been determined that the liability therefore was the result of its negligence, imprudence, willful misconduct, malfeasance, fraudulent acts, or breach of applicable law; provided, however, that Plan Sponsor shall remain liable for the payment of all Claims under the Plan.  No termination of this Agreement shall reduce Claims Administrator's obligations under this provision.

92. Providence's employees/Plan participants have received and continue to receive letters and phone calls from their healthcare providers and third-party collection agencies demanding payment for claims submitted to, but not processed or paid by, LEA.

93. Providence, as Plan Sponsor, has suffered and continues to suffer damages, including but not limited to legal fees and costs, based on the negligent actions and omissions of LEA, and based upon LEA's negligence, imprudence, willful misconduct, malfeasance, fraudulent acts, and breaches of applicable law with respect to functions required of LEA pursuant to the Agreement.

## COUNT VI

### SPECIFIC PERFORMANCE (LEA)

94. Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

95. Providence and LEA had a valid and enforceable contract.

96. Providence has been and continues to be ready, willing and able to perform its obligations under the Agreement.

97. LEA has failed and refused to perform its obligations as required by the Agreement and has no valid justification for its failure and refusal to do so.

98. There is no other adequate remedy at law.

## COUNT VII

### CLAIM FOR EQUITABLE ACCOUNTING ARISING UNDER 29 U.S.C. § 1132; ERISA § 502(a)(3) and the AGREEMENT (LEA)

99. Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

100. 29 U.S.C. § 1132(a)(3) provides that a civil action may be brought

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

16

101. LEA has violated its obligations under 29 U.S.C. § 1132(a)(3) and the Agreement by not providing Providence timely and accurate information necessary for the funding and administration of the Plan.

102. LEA failed and refused to provide accurate claims data and access to the checking account clearly reflecting when claims were received, processed and paid (if they were paid), in part because of their misapplication of funds received to unrelated claims.

103. Providence is now being pursued by providers to pay outstanding claims. LEA has failed to provide adequate information for Providence to be able to determine the legitimacy of these claims.

104. As a result of LEA's failure to provide this vital information, Providence, as a Plan fiduciary, seeks an equitable accounting.

WHEREFORE, Providence respectfully demands judgment as follows:

(a) As to Count I, awarding Providence damages due in an amount to be determined at trial, but believed to be approximately $750,000, as a result of GCG's and LEA's fraudulent misrepresentations made in the 2018 Proposal and LEA's fraudulent deposit and then immediate withdrawal of funds into Providence's account;

(b) As to Count II, awarding Providence damages in an amount to be determined at trial as a result of GCG's and LEA's negligent misrepresentation of claims data in the 2018 Proposal, plus pre-judgment interest accrued thereon until the date of judgment;

(c) As to Count III, awarding Providence damages in an amount to be determined at trial as a result of GCG's and LEA's negligence in advising Providence (GCG) and administering the Plan (LEA), plus pre-judgment interest accrued thereon until the date of judgment;

(d) Awarding Providence punitive damages in connection with Count I in an amount to be determined at trial, but believed to be in excess of $500,000 based on GCG's and LEA's willful and wanton conduct;

(e) Awarding Providence other appropriate equitable relief, to redress violations of ERISA and the Agreement or to enforce any provisions of ERISA or the terms of the Plan;

(f) Awarding Providence attorneys' fees under 29 U.S.C. §1132(g)(1), court costs and all other reasonable costs incurred; and

(g) Awarding such other and further legal or equitable remedy or relief as the Court may deem just and proper.

Dated: New York, New York
January 31, 2022

MORRISON COHEN LLP

By: ___/s/ Jay R. Speyer_____
Jay R. Speyer
Collin A. Rose

909 Third Avenue
New York, New York 10022
(212) 735-8600
jspeyer@morrisoncohen.com
crose@morrisoncohen.com

-and-

HOLIFIELD & JANICH, PLLC

By:  ___/s/ Al Holifield_____
Al Holifield (PRO HAC VICE)

11907 Kingston Pike, Suite 201
Knoxville, Tennessee 37934
 (865) 566-0115
aholifield@holifieldlaw.com

*Attorneys for Plaintiff*

4883-5912-4747, v. 3